We have number 24-104449 Florida Virtual School v. K-12, Inc. Oh, I'm sorry, wrong case. Before that, we have 24-10731 United States of America v. Antione Ladson. Mr. Cavender Good morning, Your Honors, and may it please the Court. Mr. Ladson's plea agreement contains an appeal waiver, but the government can't show that the waiver is enforceable. The District Court didn't inform him of the scope of the waiver and didn't ensure that he understood he was giving up his right to appeal in most circumstances. Under Buschert and Rule 11, the colloclue is deficient and the waiver is unenforceable, so the Court should reach the merits of his appeal. On the merits, the District Court committed two clear errors in calculating his guidelines range. First, it misapplied the cross-reference to the attempted murder guideline, and second, it misapplied the serious bodily injury enhancement. The shooting lacked malice aforethought, and the resulting superficial injury only rose to the level of bodily injury. Starting with the cross-reference, any crime less serious than attempted murder means 2K 2.1 applies here, not a cross-reference to 2A. The evidence here, an assault by an armored man, Mr. Bragg, followed by a heat of passion shooting by Mr. Ladsen, doesn't support the level of mens rea required for attempted murder malice. The government failed to prove that the shooting did not result from a sudden quarrel or heat of passion, which makes it attempted manslaughter. Because the attempted manslaughter calculation is lower than the 2K calculation, the 2K calculation should have controlled. Even if the attempted murder cross-reference applies, the serious bodily injury enhancement doesn't. The minimal evidence in the record shows only that Mr. Bragg was treated for a superficial injury that required follow-up care of Tylenol and a muscle relaxer. Because the government presented no evidence of the severity of pain or that medical intervention was required, the government failed to carry its burden of proving that he suffered a serious bodily injury. So, we ask the court to vacate Mr. Ladsen's sentence and remand for resentencing. Can we touch on the appeal waiver? Yes, Your Honor. So, first, the touchstone of our analysis is the knowingly and voluntarily requirement, right? That's correct, Your Honor. And Boyd put a little bit of a gloss on that, said the touchstone is whether it was clearly conveyed to the defendant that he's giving up his right to appeal under most circumstances. And I don't think we have that here from the very minimal colloquy. Aren't the circumstances here pretty similar to those in Boyd? It seems to me that Boyd makes your case harder rather than easier. I don't know that it does, Your Honor, because in Boyd, so the defendant was advised that he was specifically advised that he could not appeal a guideline sentence. And importantly, he said that he understood that. And that was exactly what he tried to do on appeal. He tried to appeal a guideline sentence. So, he was specifically advised that he could not do what he eventually tried to do. So, here, the district court referenced the appeal waiver during the hearing, right? There was a mention of it during the appeal. And then your client told the district court that he had reviewed the plea agreement in its entirety with his attorney, right? Yes, Your Honor. And he initialed every page of the plea agreement, including the one with the plea waiver, right? That's correct. And then signed the agreement at the end. So, on what, how would we conclude that he didn't know what was in it? So, Busher requires a little more than, it doesn't allow the court to simply look at the colloquy. You have to look, or to look to the plea agreement itself, excuse me. You have to look at the colloquy itself. And so, like in footnote 19, it said that the waiver requires special attention from the district court. And that didn't happen here. We only got this very basic question, whether he was, the very basic question from the district court here. And that's not enough in this case. We think he needs to go beyond that. In most of the cases where it's found that it wasn't known involuntary either, you don't have the evidence that we have here, or something was specifically said by the court that might have confused the issue, right? Yes, Your Honor. But the court, I'm not going to argue. I wish that courts would spend more time on the specifics than this. I don't argue with that, but I'm not sure where the court referenced it and the defendant stated that he had discussed it with his attorney, and then initialed not only the end, but each page. It's, in the absence of any language that adds confusion, it's hard for me to see how we wouldn't conclude that the defendant knew what was in this agreement. Your Honor, I think the language here, what the district court said, it made it kind of confusing. It added confusion because it wasn't clear what the limitations on the plea agreement, the limitations on the waiver were, and so I think that additional confusion makes this more like Buschert, where the defendant was told that he may have the right to appeal under some circumstances. So what language do you think is comparable to that here? Because it said that he was, excuse me, Your Honor, I'm just blanking on the language here now. He was informed that the, the language, if I could help you out there, is the court said you expressly waive your right to appeal your sentence in accordance, I think it says correspondence, but it should be accordance, with the limitations set forth in your plea agreement. Yes, Your Honor. Thank you, Your Honor. So I think that, that added some confusion to it because it's not clear what the limitations set forth in the plea agreement were, and that's the whole point of the colloquy, is the, the court needs to make sure that the defendant is informed what the... But if you'd read the plea agreement, wouldn't you be clear on what the limitations were? I think, well, first of all, so it's not, it's not enough just to read the plea agreement itself or to go over with counsel. The district court requires that special attention, and I don't think that was enough here. So the, I also look at Rule 11, what that requires, it requires that the defendant be informed of the terms of the waiver and determines that he understands, and here there was no there was no understanding conveyed by the district court, and the district court didn't ensure that he understood that he was waiving his right to appeal. It only asked whether it was something that he went over with his attorney. I think we've got your argument on that, if you want to cover your other items. As to the cross-reference, first, as to the attempted murder cross-reference, I think it's important to consider the facts of the situation that these two gentlemen were in. This was an angry confrontation, they're nose-to-nose. If the court hasn't seen the video of it, I would certainly encourage the court to look at it because I think that shows the whole picture. These gentlemen are nose-to-nose, they're circling each other. It's what the district court termed a shoot-or-be-shot situation. For attempted manslaughter, it still includes an intent to kill, but it has to show that the defendant acted intentionally but without malice upon a sudden quarrel or heat of passion, and I would submit that that's what we have here. We have the sudden quarrel or heat of passion was exactly the situation that these gentlemen were involved in when the shooting occurred. If the cross-reference didn't apply, then the 2K, 2K1 calculation would have controlled. That's also the case for the serious bodily injury enhancement. If either of these didn't apply, either the cross-reference or the serious bodily injury enhancement didn't apply, then the 2K calculation comes into play. And here we just don't have enough evidence to show that he suffered a serious bodily injury. It requires extreme physical pain. The two aspects that the government's relying on are either extreme physical pain or requiring medical intervention such as hospitalization. He was hospitalized overnight though, right? He did go to the hospital and he was evaluated, but I think the key is whether I focus on the word requiring. Did it actually require hospitalization or could he have been treated elsewhere? And we just don't have any evidence of what treatment he underwent at the hospital. We know that he got a CT scan, so we know he was looked at, but we don't know that he received any treatment. We don't even know if he got a stitch from it. I thought it was in the record that he had an injury to his internal carotid artery. He had an injury to his carotid artery, yes, Your Honor, but we don't know. It doesn't sound fun to me. No, it doesn't, Your Honor. And so it certainly makes sense that he would go get that checked out, but we don't have any, but that only puts it in the bodily injury category because bodily injury is defined as a significant injury, one that's painful or obvious. We agree that this is painful or obvious or is of a type for which medical attention ordinarily would be sought. And so we understand that you would ordinarily seek medical attention for an injury of this type. But that's, as I said, that's bodily injury, not serious bodily injury. What's our standard of review for looking at the district court's decision on that? It's clear error, Your Honor. Do we really say that there's clear error on deciding that getting shot in the neck with a military-grade ammunition did not cause serious bodily injury? I think on this record you can, you should reach that finding, Your Honor, reach that conclusion because there's just no, all, the only evidence we have is these two pages of a medical record, and I would submit that that's not sufficient. And we also have the video showing him within ten seconds of getting shot, he's back up again and he's casually strolling out of the breezeway, he's not even, not even holding a hand to his neck. Thank you, Your Honor. Thank you. Thank you. Good morning. May it please the Court, Colette Cunningham for the United States. District Court did not clearly err in finding, by a preponderance of the evidence, that Ladson committed attempted second-degree murder and that Bragg sustained serious bodily injury. Starting with the attempted murder cross-reference, the Court was not required to find, on this record, that Ladson shot Bragg in a heat of passion on adequate provocation. As the Court could see on the video, Ladson was the first to get his gun out, he was taller than Bragg and had the larger weapon, the two were up in each other's faces and up against one another, but it was Ladson who stepped back, aimed at Bragg and shot him in the neck. Bragg's gun was by his side when Ladson shot him. After the shooting, Ladson skipped off through the parking lot, pointed his gun at someone on the second floor and circled back through the breezeway as if looking for Bragg. The District Court reasonably determined from the video and the undisputed PSR facts that Ladson took a substantial step towards killing Bragg and that Ladson had a specific intent to kill that wasn't negated by a provocation adequate to cause a reasonable and ordinary person to kill someone. Whereas here, the record amply supports the District Court's findings, this Court must affirm. Because the Court applied that attempted murder cross-reference, we know the Court found by preponderance of the evidence that Ladson had the mental state required for attempted second-degree murder. The Court had rejected his arguments that this was self-defense and had rejected his arguments that this was manslaughter. The PSR stipulated facts indicated that it was a verbal confrontation with the two exchanging words in one another's faces while holding their firearms. We know Ladson had a short-barreled rifle where Bragg had only a pistol. We know that Ladson used .223 caliber ammunition, which is similar to that used in military assault rifles. And we know that Ladson ran away as Bragg stumbled and fell. The events after the shooting are relevant, too, because the District Court could reasonably infer from them that Ladson didn't lose his self-control. The Court could find that his intent to kill reasonably transcended any momentary provocation Do we have any idea what they were talking about? Does the record reflect that at all? It does not, Your Honor. So we just have the video, we have the PSR, but there's more than enough in those sources for the District Court to have found as it did. Is Mr. Ladson correct that to establish a serious bodily injury, hospitalization has to have been required? So, Your Honor, the serious bodily injury enhancement allows for multiple different ways for that element to be met. One way, and we believe that both were met here. One way is for the injury to require medical intervention such as hospitalization. The other way is for the injury to involve extreme physical pain. So starting with the hospitalization. The District Court could reasonably find and could reasonably infer that the injury required hospitalization based on the nature of the injury, the hospital admission, and the overnight stay. It's undisputed as the Court has noted in the PSR facts that he was kept overnight. So getting back to my question, it sounds like you agree that the medical treatment has to have been required. It does have to be required, yes, Your Honor. And we do think here that you can infer, the District Court could infer that hospitalization was required from these different factual items in the record. The Court can rely on its common sense to find that hospitals don't admit people and keep them overnight if that treatment isn't required. But on this record, the District Court also could find that the gunshot wound was the type of injury that involved extreme physical pain. Mr. Bragg was shot in the neck at close range with ammunition like that found in a military assault rifle. The Court can infer that that is an extremely painful injury. We also have the video evidence of him falling to the ground, of him bleeding, putting his hand to his neck, and being taken to the hospital relatively quickly. That's enough to find extreme physical pain under a preponderance of the evidence standard. The Court has found in other cases where a victim had sustained a broken nose that that was enough. A gunshot wound surely rises to that level. As my colleague noted, he concedes that the injury is painful but wants the evidence viewed in a particular way to suggest that it was a less serious injury than it truly was. But the Court wasn't required to view the evidence that way, and it was permissible for the Court to find that Mr. Bragg sustained a serious bodily injury here. What about the appeal waiver? I know the government has argued that there was a knowing and voluntary plea waiver, right? Yes, Your Honor. Do you think that the district court here, even if it was legally sufficient, do you think that district courts perhaps should do more to ensure that a waiver is knowing and voluntary? Well, Your Honor, we do believe that the waiver here is sufficient. Certainly all parties would want the record to be as clear as possible so that the sentence appeal waiver results in a motion to dismiss being granted without a case proceeding to oral argument. I think that's in the best interest of the Court and the parties. However, as was discussed with my colleague, this appeal waiver meets, in our view, both Boucher prongs and Rule 11. The district court engaged Ladson about the sentence appeal waiver, specifically conquestioning him about it during the Rule 11 colloquy. He did expressly waive his right to appeal his sentence. The plea agreement lays out the specific exceptions to that waiver. The Court confirmed that Mr. Ladson had the plea agreement in front of him at sentencing and referenced that. Do you agree with regard to the appeal waiver itself? The Court only said that one sentence that I read earlier. Yes, Your Honor. That's correct. That is all that was said specifically about the appeal waiver. Unlike the statements in Boucher, we do not find this statement to be confusing. The district court did not inject something inappropriate or suggest that there was some difference between the sentence or the conviction that might have made this confusing. Is it clear from the statement that the district court made whether limitations pertains to the waiver or to the sentence, the right to appeal the sentence? He just says, with the limitations set forth in your plea agreement. Yes, Your Honor. We do think that it is clear because, again, we are looking at the context of this statement. He is waiving his right. The Court explained to Ladson that he was waiving his right to appeal his sentence in accordance with the limitations set forth in his plea agreement. The reasonable conclusion from that is that the Court was referring to the exceptions of the sentence appeal waiver. When the Court asked Ladson if that was consistent with what he went over with his attorney, he replied, yes, Your Honor. Even if the Court thought that this colloquy was deficient, the record makes manifestly clear that Ladson understood the full significance of the waiver. The Court established that Ladson was entering this plea freely and voluntarily, that he believed it was in his best interest. He confirmed that he'd had enough time to speak with his attorney and that he was satisfied with her representation. The Court also discussed some aspects of sentencing as required by Rule 11, letting him know that he would be sentenced without allowing him to withdraw his plea, that the advisory guidelines were advisory. But none of that pertains to the appeal waiver specifically? Not directly, Your Honor, but the greater character of this record goes to that manifestly. What we said in Buschert was that an examination of the plea agreement's text was insufficient to find the waiver knowing and voluntary. How does the MIA reminder that there is a sentence appeal waiver in the plea agreement enough to meet that requirement? Your Honor, here there was both the Court directing Mr. Ladson's attention to the plea agreement, asking him questions to make sure while Mr. Ladson was under oath that Mr. Ladson explained to the Court that he did understand what was there, that he had read it, that he had initialed the pages, that he had signed that final pages certification. The Court did specifically, while discussing the important terms of the plea agreement, point to this sentence appeal waiver. We went on to say in Buschert that the defendant must be told that his appeal waiver gives up the right to appeal under, quote, most circumstances. Here the district court just said limitations. How does that convey that he's waiving his right under most circumstances? Because taken with the language in the plea agreement, the plea agreement was very clear that the appeal waiver waived the right in most circumstances except for those specifically limited. And Buschert did. Just cutting out. Yes, Your Honor. And the reason for a very thorough interrogation of the defendant in the plea colloquy, especially with regard to waivers, is to avoid the problem we have here. We avoid hashing it out here. So now the question becomes, in that scenario, I've read this colloquy, the judge doesn't know as much that's in a plea agreement normally. Otherwise, that puts the judge into the bargaining process. You follow me? Yes, Your Honor. The judge reads the plea agreement and says to himself, I don't understand this. He gets into a colloquy with the lawyers ahead of time, now here's the defendant. So we're hashing. And that's an unethical position to put the judge in. Do you agree with that? I certainly. The judge cannot engage in colloquies with the lawyers and the defendant about what the plea agreement means. It kind of puts them into the negotiating of the plea agreement. I certainly agree, Your Honor. All right. So here we are in this kind of a situation. Do we expect the defense counsel to clear up the record? The defense counsel is not going to say to Your Honor, let me interrogate my client. And now the defense lawyer does exactly what the court should have done. You understand me? I think I understand you, Your Honor. That wouldn't work. What that does, it leaves it to the prosecutor. When the prosecutor sees this happening, it's the prosecutor's obligation to clear it all up. Because the prosecutor knows more than what the judge does about the whole plea agreement arrangement. You follow me? From beginning to end. I do follow, Your Honor. That's a heavy burden on prosecutors. And Your Honor, it may have been in this situation that everyone in the room felt that the record was sufficient to establish the knowing involuntary waiver. But we see cases like this all the time. Everybody in the room knew about this, not the other thing. But none of it's in the records under oath, is it? We are supposed to, everybody in the room knew. That's a classic way of having an ineffective assistance counsel play. Anyway, that's my point. The point is, the prosecutors have got to take a heavy burden in this kind of a situation to make sure that the waiver is covered adequately. Because judges are somewhat at a disadvantage to do that, other than pure colloquy. Well, thank you, Your Honor. I will relay that to my colleagues. Thank you. And you take that back to Garcia. That's the message. Yes, Your Honors. There's just one comment that I would like to address of my colleagues, if I may briefly. There was a reference to the shooter be shot comment. And this is a reference to something that the court said at sentencing, as it was considering the 3553A factors to determine an appropriate sentence. The court had already rejected Mr. Ladson's argument that this was attempted voluntary manslaughter. And the court was considering the nature and circumstances of this offense, which of course was appropriate for the court to consider. The court also considered Ladson's acceptance of responsibility and his potential for rehabilitation, which were all mitigating factors for the court. So we believe that that statement does not undermine the court's prior findings. It simply reflects the district court's consideration of factors in determining an appropriate sentence. If the court has no further questions, thank you. We ask that this court dismiss Mr. Ladson's appeal based upon the sentence appeal waiver. And if the court does not, we ask that the court please affirm the district court's sentence. Thank you. Thank you. If I don't, Mr. Cavender? Thank you, Your Honors. As to the appeal waiver, we're not asking for much. We're asking for three things. We're asking that the defendant be told that he has a right to appeal and he's waiving that right, that the only exceptions to the waiver are A, B, C, and D. Do you understand? If those three things are done, then the appeal waiver is going to be enforced all day long. And that's not what we have here. I can see why. I mean, it makes sense to me, frankly, that the district court would choose to say those things to make it really clear. But we don't have a case that says you need to do one, two, three. Do we? We don't, Your Honor. And so I'm kind of putting that together with the cases that we do have. And I'm suggesting that that would be an appropriate thing for the court to do here, to give district judges essentially a safe harbor, so they know if they do one, two, three, that it's going to be upheld. And that also, to Judge Choflat, you're concerned about what the AUSAs need to do during these colloquies. It lets them know that they just need to make sure that the district judge did one, two, three. And if those boxes are checked, then the appeal waiver is going to be enforced all day long and we would not be here. As to the attempted murder cross-reference, I would just again focus on the facts that immediately surrounded the shooting, where you've got this situation where these gentlemen are toe-to-toe. They're both armed. We don't know exactly what they're saying, but it certainly didn't look pleasant. And the district court thought that this was a shoot-or-be-shot situation. So we didn't pursue a self-defense argument on appeal. We did pursue it below. But I do think that it's sufficient to raise what's a heat of passion, passion or fear, rage in which defendant loses his normal self-control as a result of circumstances that would provoke such a passion in an ordinary person. And I would submit that the facts here, that's what we have, Your Honors. There are no further questions. I appreciate it. Thank you. Thank you. Thank you. Now we get to our last question.